UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ONeal Johnson, *Plaintiff*, v. Allure Lifestyle Communities, *Defendant*. | No. 23 CV 17062 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Following his termination in 2022, ONeal Johnson filed this employment discrimination suit against his former employer, Allure Lifestyle Communities. Before the court is Allure's motion for summary judgment. [Dkt. 82.][1] The motion is granted.

## I. Local Rule 56.1

Local Rule 56.1 lays out the rules governing summary judgment motions in this district. See N.D. Ill. Local R. 56.1. Because failure to abide by these rules can prove dispositive, the court begins by examining the parties' compliance.

Start with Allure. As the moving party, Allure had to file a statement of material facts. L.R. 56.1(a)(2). Each fact had to be set out in a concise numbered paragraph and "supported by citation to the specific evidentiary material, including the specific page number, that supports it." L.R. 56.1(d). And any evidentiary material Allure used to support a fact had to be included with the statement of facts as numbered exhibits. L.R. 56(d)(3). Allure correctly followed this procedure. [Dkt. 83.]

Because Johnson is proceeding *pro se*, Allure had one additional obligation: providing Johnson with an explanation of the summary judgment procedure. L.R. 56.2. Allure did this too. The L.R. 56.2 notice broke the process into easy-to-understand steps, ensuring that Johnson had all the resources and direction needed to abide by the rules when filing his opposition motion. *Id.*

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

Now turn to Johnson. As the nonmoving party, he had to file a response to the movant's statement of facts. See L.R. 56.1(b)(2). Johnson filed this response. [Dkt. 87.] So far, so good.

Just as for Allure's statement of facts, the Local Rules provide detailed instructions a party must abide by when drafting a response. In paragraph numbers that correspond with Allure's, Johnson was to relay the text of Allure's fact and then set forth his response. See L.R. 56.1(e)(1). "Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." L.R. 56.1(e)(2). Johnson's response mostly satisfied this requirement. While he did not set forth the entire text of Allure's facts, he provided a sufficient summary and included numbered paragraphs that corresponded to each Allure fact. [Dkt. 86.]

Having made it this far, it's evident that Johnson knew the Local Rules and understood what was expected of him. And the Local Rules explain that a party disputing a certain fact (even if only in part) must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." L.R. 56.1(e)(3). The court may deem a fact admitted if a party does not dispute the fact with "specific citations to evidentiary material." *Id.*

This is where things went wrong. For the most part, Johnson cited no evidence at all when disputing Allure's facts. [Dkt. 86, ¶¶ 5–9, 11, 23, 29–30, 33, 35–37, 43, 47–49, 51, 60–63, 66–67, 70–77, 79–80.] And when he did, the cited material either didn't support his alleged dispute, *id.* at ¶¶ 2, 18–19, 26, 41–42, 45, or was not attached as an exhibit to his response (meaning the court had no way of verifying whether it supported a dispute), *id.* at ¶¶ 52–53, 59, 65, 68–69, 78.

Johnson's response also contained legal argument, see *e.g.*, *id.* at ¶¶ 25, 75–76, and attempted to set forth many additional facts (usually without citing evidentiary material), see *e.g.*, *id.* at ¶¶ 7, 12, 18, 41, 47, 66. "A response," however, "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made," nor may it include legal argument (other than objections). L.R. 56.1(e)(2).

Should a party wish to set forth facts not present in or fairly responsive to the nonmoving party's statement, they may do so by submitting an additional statement of material facts. L.R. 56.1(b)(3). The additional statement of facts is subject to the same rules that governed the moving party's statement of facts, meaning it must cite "specific evidentiary material, including the specific page number, that supports it." L.R. 56.1(2). Johnson filed an additional statement of facts, and the court considers it to the extent supported by the cited evidentiary material. [Dkt. 87.]

Any party, including a *pro se* litigant, who fails to comply with Local Rule 56.1 does so at their own peril. See *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's

discretion, even though employee was pro se litigant"); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) (same). *Pro se* litigation, moreover, is not unfamiliar to Johnson. Quite the opposite: he has over eight years of experience filing lawsuits in this district, some of which he has litigated on his own. See, *e.g.*, *Johnson v. Habitat Company*, Case No. 25-cv-6334; *Johnson v. Vanzant et al.*, Case No. 20-cv-6251 (N.D. Ill.); *Johnson v. Edminiat Holdings et al.*, Case No. 18-cv-2865 (N.D. Ill.); *Johnson v. Smith Jr. et al.*, Case No. 22-cv-5405 (N.D. Ill.); *Johnson v. Symon et al.*, Case No. 20-cv-2657 (N.D. Ill.); *Johnson v. Shockley et al.*, Case No. 19-cv-6159 (N.D. Ill.); *Johnson v. Deboni et al.*, Case No. 17-cv-4678 (N.D. Ill.); *Johnson v. Goldberg*, Case No. 17-cv-2841 (N.D. Ill.); *Johnson v. Rempas et al.*, Case No. 20-cv-3079 (N.D. Ill.); *Johnson v. Edward et al.*, Case No. 21-cv-0738 (N.D. Ill.); *Johnson v. Malti Family Management Service Group, LLC et al.*, Case No. 22-cv-1859 (N.D. Ill.); *Johnson v. Preservation Management*, Case No. 21-cv-2878 (N.D. Ill.); *Johnson v. McDonald et al.*, Case No. 23-cv-3200 (N.D. Ill.); *Johnson v. City of Chicago et al.*, Case No. 25-cv-0875 (N.D. Ill.).

Consequently, when Johnson does not properly dispute them, the court deems Allure's facts admitted. It also considers relevant facts properly set forth in Johnson's statement of additional facts and recounts the material facts as favorably to Johnson as the record and Local Rule 56.1 permit.

\* \* \*

Before diving into the facts, however, one more aspect of the summary judgment proceedings warrants discussion. Because Johnson's filings were at times difficult to follow, the court found itself sifting through hundreds of pages of depositions to decipher his exact arguments and proposed facts. In doing so, it observed abhorrent behavior by Johnson during his deposition.

As just a small sampling—in response to an appropriate follow up question from Allure's counsel, Johnson said, "You see what I'm trying to tell you how phony you is? You like the fake news Trump talk about," dkt. 83-5 at 37; in response to another, he replied, "There's something wrong with you," *id.* at 55; when counsel asked the court reporter to read back a portion of testimony, Johnson said, "you just like to be proved wrong, don't you? You're too young to not have a memory to be that short," *id.* at 46; when Johnson decided to end his deposition prematurely, he stated, "You're 5:00 o'clock is up. It's time for me to go get ready for Friday. It's turn up Friday time," *id.* at 80, he later said to counsel, "I'm not giving you another second. Stop crying so," *id.* at 81, and "just go get a little more school, you'll be all right," *id.*, at 80-81. At risk of stating the obvious, Johnson was uncooperative and often unresponsive during his deposition. For her part, Allure's counsel exhibited remarkable patience throughout the deposition.

It should come as no surprise that this type of behavior during a deposition is grounds for sanctions, including dismissal. See, *e.g.*, *Beasley v. Hicks*, 2021 WL

3

2533301, at *3 (S.D. Ill. June 21, 2021) (dismissing lawsuit after plaintiff made unprofessional and vulgar remarks during his deposition). While the court will not impose sanctions here, it warns Johnson against repeating such behavior in future litigation.

## II. Background

### A. The Parties and Key Players

Allure Lifestyle Communities, a property management company operating adult and independent senior living communities, hired ONeal Johnson as an at-will employee in February 2022 to work in maintenance at one of its properties, Hanover Place Apartments. [Dkt. 86, ¶¶ 1, 9.]

Johnson, a Black man with post-traumatic stress disorder and depression, began working as a Maintenance Technician but Allure eventually promoted him to Maintenance Director. [*Id.*, ¶¶ 2, 9, 28.] His job duties included responsibility for overall maintenance and operation of Hanover Place, preparing vacant units for new residents, and, after his promotion, supervising assistant maintenance technicians and cleaning porters. [*Id.*, ¶ 11.]

In both roles, he reported directly to Thomas Holmes, the Property Manager. [*Id.*, ¶ 10.] Holmes is Black. [*Id.*] Johnson also worked with fellow maintenance technician, Lee Williams (Black), who, after Johnson's termination, took over the role of Maintenance Director. [*Id.*, ¶ 16.]

Along with Holmes, local management at Hanover Place included Christina Tuohy (white), Assistant Property Manager, and Delaneo Johnson (DJ) (Black), Leading Manager/Corporate Sales Specialist. [*Id.*, ¶ 12.] DJ, unlike Holmes and Tuohy, had no supervisory authority over Johnson. [*Id.*, ¶ 13.]

Allure also had regional management with oversight of Hanover Place. [*Id.*, ¶ 14.] Rebekah Ingraham (white) served as the Regional Director of Operations; Veronica Beekman (white) was the Regional Manager until about April 2022; and post-April 2022, Sherry Wright (white) assumed the role of Managing Director of Portfolio Operations overseeing Hanover Place. [*Id.*]

Finally, Randy Geoque (white) was the Chief Administrative Officer. He had responsibility for the day-to-day operations of Allure's human resources and administrative functions. [*Id.*, ¶ 15.]

### B. Johnson's Conflict with Assistant Manager Tuohy

While Assistant Manager Tuohy used to "love" Johnson's work, her demeanor toward him changed after management selected Johnson's vendors for flooring and painting, replacing Tuohy's family members, who previously acted as Allure's

4

vendors. [*Id.*, ¶ 17.] After the vendor change, Tuohy began to harass Johnson. In addition to scrutinizing his vendors, she went "ballistic" whenever he spoke at daily staff meetings (referred to as "stand-up" meetings). [*Id.*, ¶ 22.] Specifically, Tuohy would scream, curse, leave the room crying, and tell Johnson he was "too loud." [*Id.*, ¶ 22.] Johnson testified that the vendor decision "was enough to make [Tuohy] a little racist." [*Id.*, ¶ 23.] Elaborating, he said she may have "hated" that he was Black and that his vendors were "Mexicans" who took over Tuohy's family's jobs. [*Id.*]

Maintenance Technician Williams testified that Tuohy's attacks were not "out of the blue" or related to Johnson's race but instead stemmed from the way Johnson "took care of certain things." [*Id.*, ¶¶ 24, 25.] It was also Williams's understanding that no one at Allure knew about Johnson's PTSD or depression. [*Id.*, ¶ 25.]

On March 8, 2022, Johnson sent Regional Manager Beekman an email stating: "Could you give me a call, [phone number], its something I'd like to discuss with you, thank you, anytime tomorrow, have a nice night." [*Id.*, ¶ 19.] During Johnson's phone call with Beekman, he told her about Tuohy's vendor-related harassment. [*Id.*, ¶ 20.] And at a subsequent stand-up meeting, Beekman informed Tuohy that vendor selection was a "business decision" outside of Johnson's control. [*Id.*, ¶ 21.]

Johnson also raised his concerns about Tuohy's harassment and interruptions with Property Manager Holmes. [*Id.*, ¶ 26.] Holmes responded by arranging for Williams to speak for maintenance in meetings instead of Johnson. [*Id.*, ¶ 26.] And he also told Johnson that he could ask Holmes to speak on his behalf and arranged a meeting between Johnson and Tuohy. [*Id.*, ¶¶ 26–27.] This arrangement worked for a brief period. [*Id.*, ¶ 26.]

In his deposition, Johnson repeatedly expressed his belief that Tuohy targeted him for harassment because she resented him over her family vendors losing work. [*Id.*, ¶ 49; see, *e.g.*, dkt. 83-5 at 52 (Johnson's deposition) (Q: "[A]re you saying [Tuohy] was harassing you because you got her family fired?" Johnson: "Exactly."); *id.* at 60 ("[Tuohy] harassed me and belittled me. She created a hostile environment. She kept standup always on some negativity, you know, and she did this because they didn't get the bid, that they got fired."); Dkt. 19, ¶ 8 (Johnson's Complaint) ("Also told [Wright] how [Tuohy] walks out of standup and all harassment of me comes from the company firing her family from the painting and flooring vendor job."); Dkt. 88 (Johnson's Summary Judgment Brief) ("Plaintiff has evidence that after he replaced Tuohy's 'family vendors' with new vendors, Tuohy and others began a pattern of hostility towards him.")]

### C. Johnson's Disability

Johnson suffers from PTSD and depression, which he manages with therapy and medication. [Dkt. 86, ¶ 28.] His conditions did not impact his ability to work in maintenance at Hanover Place and, when asked during his deposition what

5

accommodations he needed, he said none. [*Id.*, ¶ 29 ("it ain't nothing that I needed.")] When hired at Allure, Johnson did not disclose his PTSD or depression, and he never formally requested an accommodation. [*Id.*, ¶ 30.]

Johnson did, however, attempt to inform several members of Allure management of his conditions at various points during his employment. First, he told Regional Manager Beekman. [*Id.*, ¶ 33.] But he did not ask her, formally or informally, for any accommodation. [*Id.*] And during a meeting with Assistant Manager Tuohy and Property Manager Holmes, he disclosed his PTSD and depression but again did not request any accommodation or action. [*Id.*, ¶ 34]

He also told Holmes about his conditions on a separate occasion, explaining that Holmes should signal to him to lower his volume if his voice ever "carried" or became "loud." [*Id.*, ¶ 35.] At no point, though, did Johnson connect his tendency to talk loudly with his PTSD or depression. [*Id.*, ¶ 36.] To the contrary, when asked whether the two were connected in his deposition, he said: "No, I'm a loud person anyway. I talk loud." [*Id.*] Williams and Wright (Managing Director of Portfolio Operations) also testified to this point, explaining that, while they both counseled him about how his loud presence could be intimidating to residents, Johnson never attributed his loudness to a medical condition. [*Id.*, ¶ 37.]

Wright knew about Johnson's PTSD and depression, too. [*Id.*, ¶ 38.] He told her in person and through texts and emails. [*Id.*, ¶ 38–39.]

### D. Johnson's Written Counseling

Johnson received a Written Counseling (a disciplinary write-up) on August 1, 2022 for communicating false information on units and failing to follow apartment turnover procedures. [*Id.*, ¶ 41.] In particular, during a stand-up meeting he misrepresented that a unit was move-in ready when it had not yet been cleaned. [*Id.*] The write-up also stated that Johnson had already been told on multiple occasions about the need to notify Property Manager Holmes of unit readiness and to turn in documentation to Property Leasing Manager, DJ. [*Id.*] Regional Director Ingraham approved the Written Counseling before both Holmes and DJ presented it to Johnson. [*Id.*, ¶ 42.]

Johnson testified that the Written Counseling was inaccurate and that Tuohy and DJ manufactured it to "set [him] up." [*Id.*, ¶ 43.] He said the two conspired both to help Tuohy and to deflect blame away from DJ for allowing a resident to arrive at a unit that was not move-in ready. [*Id.*] He based this belief solely on his observation that Touhy had left a meeting upset a few weeks earlier and later met privately with DJ. [*Id.*]

A few days after he received the Written Counseling, Johnson reached out via text to the resident who allegedly arrived at the unclean apartment to obtain pictures

6

of the unit.[2] [*Id.*, ¶ 44.] The resident sent Johnson the pictures. [*Id.*] The next day, however, the resident contacted Tuohy, provided her with screenshots of the text exchange, and told her that they did not want to be involved in the workplace dispute. [*Id.*]

Johnson brought his concerns about the Written Counseling to Chief Administrative Officer Geouque through a written grievance. [*Id.*, ¶ 46.] While the grievance contained many reasons why he believed the disciplinary action should be revoked, it did not allege that anyone discriminated against him because of his race or disabilities. [*Id.*, ¶ 47.]

### E. DJ's Harassment

Johnson testified that Property Leasing Manager DJ also harassed him by speaking loudly and disrespectfully to him in public. [*Id.*, ¶ 50.] Johnson brought this behavior to Property Manager Holmes's attention, too. [*Id.*, ¶ 52.] He texted Holmes on multiple occasions—once saying: "Could you tell DJ that I'm real sick, can he give me a break today, I'm trying to get threw the day"; another time saying, "please talk to DJ, he's talking loud in the lobby… I tried to end the conversation cause residents are walking by…" and adding, "[p]lus I've told you I'm sick trying to get threw these days to complete these apartment, I can't be upset with the condition I'm in, you see I don't even talk much, or socialize, all I ask is DJ to stop what he's doing, thank you." [*Id.*, ¶ 53–54.] Johnson testified that his reference to "sick" in these texts referred to his depression and PTSD. [*Id.*, ¶ 57.]

### F. Johnson's Suspension and Termination

On August 10, 2022, Johnson was late to work because he was attending a doctor's appointment. [*Id.*, ¶¶ 54, 57; Dkt. 95, ¶ 4.] That same day, Tuohy and Holmes called Wright (Managing Director of Portfolio Operations) and reported that Johnson had disrupted a morning meeting and that multiple residents had complained that he was banging on doors asking about their move-in and the quality of work in their

---

[2] Johnson objects to evidence about complaints or statements from residents, arguing that Allure did not provide him with the names of the residents so that he could depose them during fact discovery. Fed. R. Civ. P. 37(c); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). He also maintains that the residents' statements are hearsay and should be excluded. First, the residents' statements are not hearsay because they are not being offered for their truth but rather for their alleged impact or effect on Johnson's co-workers and supervisors in the lead up to his suspension and termination. *See United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015). Second, even assuming there was a discovery violation for failure to provide the names of the residents, it was harmless. As discussed *infra*, in his deposition Johnson admitted that he approached the resident to ask about their move-in. [Dkt. 83-5 at 79.]

7

units. [Dkt. 86, ¶ 58.] The residents, Tuohy and Holmes explained, felt threatened by Johnson's behavior. [*Id.*]

During his deposition, Williams testified that he too heard residents complaining about Johnson knocking at their doors. [*Id.*, ¶ 59.] He also said residents had reported that they experienced intimidating behavior from Johnson and asked that their maintenance requests be completed by Williams instead. [*Id.*, ¶¶ 69.] Williams previously informed Holmes of these complaints. [*Id.*]

Johnson's act of knocking on resident's doors, if true, would be unusual—maintenance leads do not go to a unit unless there's a work order and Wright explained that going to a unit to ask about the quality of the maintenance work without direction to do so is "considered a threat." [*Id.*, ¶ 60.] Wright also said she had witnessed Johnson become agitated with Tuohy and Holmes during a previous stand-up meeting. [*Id.*, ¶ 61.]

After talking with Tuohy and Holmes, Wright called Johnson to discuss the report. [*Id.*, ¶ 62.] He initially denied approaching residents' doors but eventually admitted to approaching a resident's unit—the same one he texted previously about obtaining pictures—to ask about their move-in. [*Id.*, ¶ 63; Dkt. 83-5 at 79 ("they had the pictures of the resident sent me those pictures, and that's the resident that I know that I was at his apartment and asking him about his move-in date. So that's when I remembered and l told her…I said, yeah, I did go to apartment. I said I went to apartment and asked on a work order and asked, and asked a resident about his move-in date."] Wright suspended Johnson pending a Human Resources investigation. [*Id.*, ¶ 64.] She also informed Chief Administrative Officer Geouque of the matter, including that Johnson initially denied the allegations. [*Id.*, ¶ 65.] Tuohy prepared an Employee Corrective Counseling Form, which included screenshots of the texts Johnson had sent to the resident, detailing the suspension and then emailed it to Wright and Geouque. [*Id.*, ¶ 71.]

Geouque conducted his own investigation, interviewing Wright, Tuohy, and Holmes. [*Id.*, ¶ 66.] Holmes and Tuohy confirmed Johnson's behavior at the August 10 meeting, described prior incidents with him during stand-ups, and explained that residents and vendors had complained about Johnson in the past. [*Id.*, ¶ 67.] Geouque asked Holmes to email him the names of residents, units, and vendors who had complained about Johnson, and Holmes did so. [*Id.*, ¶ 70.]

Geouque also called Johnson to discuss his alleged conduct and hear his side of the story. [*Id.*, ¶ 72.] Geouque testified that during the call, Johnson became argumentative, aggressive, and insubordinate toward Geouque. [*Id.*, ¶ 75.] He yelled, cursed, and denied all wrongdoing. [*Id.*] Taking into account his investigation and Johnson's behavior on the call, Geouque terminated Johnson's employment effective immediately because he believed Johnson demonstrated a pattern of misconduct that would continue. [*Id.*, ¶¶ 76–77.]

8

After the call ended, Geouque filled out an Employee Corrective Counseling Form describing Johnson's pattern of performance and conduct issues and memorializing his termination. [*Id.*, ¶ 78.] He did not document Johnson's behavior toward him during the phone call. [Dkt. 95, ¶ 19.]

\* \* \*

Following his termination, Johnson filed suit against Allure. Broadly construed, he brings a claim for failure to accommodate under the ADA; and claims for discrimination, retaliation, and hostile work environment under Title VII, § 1981, and/or the ADA.[3]

### III. Analysis

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of proving the absence of such a dispute. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. See *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

#### A. Reasonable Accommodation

The ADA provides that a covered employer shall not 'discriminate against a qualified individual with a disability because of the disability of such individual.'" *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005) (quoting 42 U.S.C. § 12112(a)). To make out a failure-to-accommodate claim, a plaintiff must prove that (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011) (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797).

In general, a plaintiff must "normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). This initial duty "requires at most that the employee indicate to the employer that []he has a disability and desires an

---

[3] Johnson does not mention his "fraudulent inducement of employment" or conspiracy claims in his response to Allure's motion for summary judgment. The court treats his lack of argument as an abandonment of those claims. See *Walsh v. Arrow Fin. Servs., LLC*, 2012 WL 255802, at *3 (N.D. Ill. Jan. 27, 2012) (["Plaintiff's] failure to reference, let alone defend, her first claim operates as an abandonment of that claim and a forfeiture of any argument opposing dismissal.").

accommodation." *Sears, Roebuck & Co.*, 417 F.3d at 803. Here, it is undisputed that Johnson never requested an accommodation. He informed several members of management of his conditions at various points, including Beekman, Tuohy and Holmes, but he admits that he did not ask for any accommodation. [Dkt. 86, ¶ 33, 34.]

Even assuming the evidence demonstrated that Johnson's loud demeanor was caused by his PTSD and that his conversations with management could be construed as requesting an accommodation, other problems loom. "[A]n employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job." *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013); *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'") (quoting § 12111(8)).

Here, as he explained in his deposition and admitted in his response to Allure's statement of material facts, Johnson needed no accommodation to perform the essential functions of Maintenance Technician or Director. [Dkt. 86, ¶ 29.] Allure therefore had no duty to accommodate his PTSD and depression. *Brumfield*, 735 F.3d at 632 ("[A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of her job—not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place.")

Lastly, although an employee is not entitled to an accommodation of their choosing, see *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008), the undisputed evidence shows that Johnson asked Property Manager Holmes and Assistant Manager Tuohy to let him know when he became too loud, and that is exactly what Tuohy did. [Dkt. 86, ¶ 35.] And Holmes, recognizing that Johnson's loud demeanor seemed to manifest often at stand-up meetings, designated Williams to speak for maintenance at those meetings. See *Gratzl v. Off. of Chief Judges of 12th, 18th, 19th, & 22nd Jud. Cirs.*, 601 F.3d 674, 682 (7th Cir. 2010) (explaining that an employer must only "make *reasonable* accommodations to the known physical and mental limitations of an otherwise qualified individual" (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added)).

So even with the benefit of reasonable inferences drawn in his favor, no reasonable jury could find that Allure failed to reasonably accommodate Johnson's disability under the ADA. Allure is therefore entitled to summary judgment on the ADA accommodation claim.

### B. Retaliation, Discrimination, and Harassment

Johnson asserts that Allure retaliated against him under the ADA for asserting his right to reasonable accommodations for his PTSD and depression, fired him because of his race and/or disability, and that Tuohy's conduct toward him created a hostile work environment.[4] The court addresses each claim in turn.

To prevail on a claim of retaliation under the ADA, a plaintiff must show: (1) statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024). For Johnson to have engaged in protected activity under the ADA, he "must have asserted [his] rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to [his] disability." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 n.6 (7th Cir. 2023) (quoting *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015)).

Johnson's retaliation claim fails for the same reasons just discussed: because he never requested an accommodation, he did not engage in any activity protected by the ADA. Nor do any of Johnson's other complaints, verbal or written, connect to any claim of disability discrimination as required for an ADA retaliation claim to survive summary judgment. *Bruno*, 93 F.4th at 1055–56 (explaining that the ADA's retaliation provision does not extend to "activities protected only by other antidiscrimination laws") "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Johnson's race and disability discrimination claims also fail. To succeed, he must point to evidence that "would permit a reasonable factfinder to conclude" that his race or disability caused his termination. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The inquiry begins with Chief Administrative Officer Geouque—the decisionmaker with regard to Johnson's termination. See *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) (explaining that a plaintiff in an employment discrimination suit "may survive summary judgment by presenting sufficient evidence 'to create a triable issue' on whether the decisionmaker had a discriminatory motivation for the adverse employment action"). Johnson admits that Geouque did not know about his disability and makes no suggestion that the decision was based on race. So no reasonable jury could find that Geouque made his decision based on Johnson's race or disability.

Johnson also points to the cat's paw theory of liability. "This theory is invoked in employment discrimination contexts when a biased supervisor, or a biased

---

[4] Johnson also checked the box for color discrimination in his complaint, dkt. 19 at 3, but he makes no mention of it in his briefing, so the court considers any claim based on color discrimination abandoned. *Walsh*, 2012 WL 255802, at *3

subordinate, 'who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Sinha*, 995 F.3d at 574 (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)). According to Johnson, the cat's paw theory is applicable here because Geouque relied in part on reports from Assistant Manager Tuohy when deciding to terminate Johnson's employment. This is true. But it's of no consequence because no reasonable jury could find that Tuohy harbored discriminatory animus. Indeed, not even Johnson seems to think Tuohy targeted him based on his race or disability—he repeatedly asserts that Tuohy's harassment stemmed from Allure's decision to replace vendors. Even if there were evidence of discriminatory animus by Tuohy, Geouque's independent investigation uncovered several legitimate grounds for termination untainted by Tuohy. Geouque interviewed Wright and Holmes about resident and vendor complaints and spoke with Johnson to discuss his conduct. When Johnson's behavior escalated during the call, Geouque immediately terminated Johnson given the demonstrated pattern of misconduct [Dkt. 86, ¶¶ 66, 67, 72, 75-77.] This undisputed evidence establishes an independent investigation that "broke any causal chain that might have extended from" possible discriminatory animus from Tuohy. *Gaines v. Dart*,—F.4th—, 2025 WL 2970377, at *6 (7th Cir. 2025).

Johnson testified that the vendor decision "was enough to make [Touhy] a little racist," dkt. 83-5 at 60, but a "plaintiff's subjective beliefs are insufficient to create a genuine issue of material fact." *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 794 (7th Cir. 2015) (internal citations omitted); *Harper v. Fulton County, Ill.*, 748 F.3d 761, 766 (7th Cir. 2014) (explaining that an employee's "speculation" and "conclusory" statements that an employer harbored discriminatory animus is not enough to create a genuine issue of material fact).

At bottom, the question is simply whether the evidence would permit a reasonable factfinder to conclude that Johnson's race or disability caused the adverse action. *Ortiz*, 834 F.3d at 765. Allure has provided nondiscriminatory reasons for suspending and later terminating Johnson as documented in the Written Counseling, the Employee Corrective Counseling Forms, and Geouque's investigation. This means that Johnson's discrimination claim fails unless a reasonable jury could find that these reasons were pretextual. Pretext is defined as a "dishonest explanation, a lie rather than an oddity or an error." *Vassileva v. City of Chicago*, 118 F.4th 869, 874 (7th Cir. 2024). But here, Johnson has failed to carry his burden of showing that Allure is lying to cover up discriminatory animus. He points to no evidence from which a jury could reasonably conclude that Allure did not "honestly believe the reason for its decision." *Saud v. DePaul Univ.*, 154 F.4th 563, 567 (7th Cir. 2025).

Finally, Johnson raises a hostile work environment claim based on Touhy's harassment.[5] "A hostile work environment claim contains four elements: (1) the

---

5       Johnson suggests in his brief that DJ's harassment also contributed to the hostile work environment, but he made no attempt to connect DJ's harassment to race or disability.

12

employee was subject to unwelcome harassment; (2) the harassment was *based on* a [protected characteristic]; (3) the harassment was so severe or pervasive that it altered the conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability." *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 560 (7th Cir. 2019) (emphasis added). Different standards apply in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker. *Trahanas*, 64 F.4th at 853. Here, the harassment came from Tuohy, a supervisor, so Allure is strictly liable when a "supervisor's harassment culminates in a tangible employment action." *Id*.

Johnson cannot establish the second element—that the harassment was based on a disability or on race. He admitted that his loud demeanor is not caused by his PTSD or depression, and does not connect any of the alleged harassment to his race. Though some of Johnson's encounters with Tuohy at standup meetings were surely unpleasant, unpleasant or unprofessional behavior cannot contribute to a hostile environment claim. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382–83 (7th Cir. 2020) ("[s]nubbing by supervisors and co-workers is not actionable") (cleaned up). In short, he offers no evidence that Tuohy or anyone acted with animus toward him based on race or disability. *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1117 (7th Cir. 2022) (rejecting hostile work environment claim where supervisor "consistently yelled at" the plaintiff because she failed to show the harassment was based on a protected characteristic).

Because no fact finder could reasonably conclude that Johnson suffered retaliation, discrimination, or a hostile work environment because of his race and/or disability, summary judgment is warranted in favor of Allure.

### IV.  Conclusion

For these reasons, the court grants Allure's motion for summary judgment.

Enter: 23-cv-17062
Date:   November 18, 2025

_____
Lindsay C. Jenkins